IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH

KATHRYN M. HAMBRICK                                                                  PLAINTIFF

  v.          Civil No. 10-2125


MICHAEL J. ASTRUE, Commissioner of
Social Security Administration
                              DEFENDANT


MEMORANDUM OPINION

## I. Factual and Procedural Background

Plaintiff, Kathryn M. Hambrick, appeals from the decision of the Commissioner of the Social Security Administration denying her claims for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"), pursuant to §§ 216(I) and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 416(I) and 423(d), and § 1602 of Title XVI, 42 U.S.C. § 1381a, respectively (collectively, "the Act"). *See* 42 U.S.C. §405(g).

Plaintiff protectively filed her DIB and SSI applications on November 28, 2007, alleging a disability onset date of February 15, 2004, due to bipolar disorder, schizoaffective disorder, attention deficit hyperactivity disorder, obsessive compulsive disorder, suicidal thoughts, debilitating paranoia, ovarian cysts, and auditory and visual hallucinations. T. 58-61, 179.  At the time of the onset date, Plaintiff was thirty three years old and was a high school graduate. T. 126, 186. She had past relevant work as a machine feeder. T. 71. Plaintiff's applications were denied at the initial and reconsideration levels. T. 80, 83, 90, 92. At Plaintiff's request, an administrative hearing was held in Clarksville, Arkansas, on March 23, 2009, at which Plaintiff

and a vocational expert testified. T. 17-57. Plaintiff was represented by counsel. At the hearing, Plaintiff amended her onset date to May 1, 2007. T. 42. Administrative Law Judge ("ALJ") Penny M. Smith issued an unfavorable decision on November 16, 2009, finding that Plaintiff was not disabled within the meaning of the Act. T. 65-73. On June 21, 2010, the Appeals Council found no basis to reverse the ALJ's decision. T.1. Therefore, the ALJ's November 16, 2009, decision became the Commissioner's final administrative decision.

## II.    Applicable Law

The Court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. *Ramirez v. Barnhart,* 292 F.3d 576, 583 (8th Cir. 2003). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support a conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). In determining whether evidence is substantial, the Court considers both evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). If, after conducting this review, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings," then the decision must be affirmed. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be eligible for disability insurance benefits, a claimant has the burden of establishing that he is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment that has lasted, or can be expected to last, for no less than twelve months. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A).

The Commissioner applies a five-step sequential evaluation process to all disability claims: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits his physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a disabling impairment listed in the regulations; (4) whether the claimant has the Residual Functional Capacity ("RFC") to perform his past relevant work; and (5) if the claimant cannot perform his past work, the burden of production then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform given his age, education, and work experience. *Pearsall*, 274 F.3d at 1217; 20 C.F.R. § 404.1520(a), 416.920(a). If a claimant fails to meet the criteria at any step in the evaluation, the process ends and the claimant is deemed not disabled. *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004).

### III.    Discussion

The ALJ found that Plaintiff's bipolar I disorder, attention deficit hyperactivity disorder and personality disorder were severe, but did not meet or medically equal one of the listed impairments in Appendix I, Subpart P, Regulation No. 4. T. 67-68. After partially discrediting Plaintiff's subjective complaints, the ALJ determined that Plaintiff retained the residual functional capacity to perform work at all exertional levels but is limited to work that involves only non-complex simple instructions with little judgment and work that is routine, repetitive and learned by rote with few variables. Further, her contact with others should be no more than superficial and incidental to her work, and her supervision should be concrete, direct and specific. Secondary to symptoms related to impairments, she should do no sustained driving. T. 69. The ALJ went on to determine that Plaintiff could perform her past relevant work as a machine feeder. T. 71. The ALJ was of the impression that the Plaintiff's mental condition is

controlled by her medications or that her overall condition has improved. T. 71. In making the RFC assessment, the ALJ gave considered weight to a consultative examination report finding no functional limitations and gave "more weight" to the opinions of the state agency medical consultants who provided assessments at the initial and reconsideration levels. T. 71.

Plaintiff contends that the ALJ failed to properly develop the evidence, failed to consider evidence which fairly detracted from her findings, and failed to apply the proper legal standards with regard to determining the credibility of subjective complaints, affording weight to physicians' opinions, and assessing the residual functioning capacity of Plaintiff to perform her past relevant work.

When evaluating the credibility of Plaintiff's subjective complaints, the ALJ is required to make an express credibility determination detailing her reasons for discrediting the testimony. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001). An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See Id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints. *Id.* Even so, the ALJ may discount a claimant's subjective

complaints if there are inconsistencies between the alleged impairments and the evidence as a whole. *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

In the present case, Plaintiff was consistently diagnosed with and treated for bipolar I disorder, attention deficit hyperactivity disorder and personality disorder. In her credibility analysis, the ALJ appears to have dismissed Plaintiff's subjective complaints at least in part because of her history of polysubstance dependence and abuse. T. 43, 49, 69-70, Def.'s Br. at 9. We note, however, that bipolar disorder can precipitate substance abuse as a means by which the sufferer tries to alleviate his symptoms. Fredrick K. Goodwin & Kay Redfield Jameson, *Manic-Depressive Illness* 219-25 (1990); Li-Tzy Wu et al., "Influence of Comorbid Alcohol and Psychiatric Disorders on Utilization of Mental Health Services in the National Comorbidity Survey," 156 *Am. J. Psychiatry* 1235 (1999); Edward J. Khantzian, "The Self-Medication Hypothesis of Addictive Disorders: Focus on Heroin and Cocaine Dependence," 142 *Am. J. Psychiatry* 1259, 1263 (1985). At least one major study has shown that "more than forty-two percent of patients meeting the criteria for a major depressive disorder (including bipolar disorder) had lifetime histories of substance abuse." Kim S. Griswold and Linda F. Pessar, *Management of Bipolar Disorder*, 62 AM. FAMILY PHYSICIAN 1343, 1345 (2000). Given the fact that Plaintiff has been diagnosed with bipolar disorder, which by its nature is a very complicated mental disorder, we believe that remand is necessary to allow the ALJ to develop the record further concerning the possible connection between Plaintiff's mental impairment and his alcohol/drug use.

The evidence also indicates that Plaintiff was experiencing financial difficulties and was utilizing the Community Health Pharmacy in Little Rock and later obtaining sample medications

from Counseling Associates, Inc. and participating in the Prescription Assistance Program. T. 294, 298. She testified at her hearing that she had been prescribed medication at times and not had the prescriptions filled because she didn't have the money for them. T. 48. 281. In his notes, her therapist recorded that Plaintiff was making payments to Clarksville Medical Group "albeit, not a lot", and that she was "trying to establish a good relationship" with the clinic. T. 371. Plaintiff testified at her hearing that she had been unable to get any treatment for the past ten months since she had moved to Fort Smith. T. 47. The ALJ, however, did not properly address this issue. Records made available to the Appeals Council subsequent to the ALJ hearing indicate that Plaintiff had been off of her medications for a period of time because she could not afford them and was in fact selling her plasma in order to buy medication for her disabled husband. T. 384. Therefore, on remand, the ALJ should also consider Plaintiff's financial constraints. *See Tome v. Schweiker*, 724 F.2d 711, 714 (9th Cir. 1984)(holding that a lack of sufficient financial resources to follow prescribed treatment to remedy a disabling impairment may be an independent basis for finding justifiable cause for noncompliance).

Of particular concern to the undersigned is the ALJ's RFC assessment. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Davidson v. Astrue*, 538 F.3d 838, 844 (8th Cir. 2009); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 f.3d 798, 801 (8th Cir. 2005). The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir.

2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003).

The evaluation of a mental impairment is often more complicated than the evaluation of a claimed physical impairment. *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996). Evidence of symptom-free periods, which may negate the finding of a physical disability, does not compel a finding that disability based on a mental disorder has ceased. *Id.* Mental illness can be extremely difficult to predict, and remissions are often of "uncertain duration and marked by the impending possibility of relapse." *Id.* Individuals suffering from mental disorders often have their lives structured to minimize stress and help control their symptoms, indicating that they may actually be more impaired than their symptoms indicate. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001); 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E) (1999). This limited tolerance for stress is particularly relevant because a claimant's residual functional capacity is based on their ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world. *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982)(abrogated on other grounds).

The overwhelming weight of the evidence indicates that Plaintiff's mental status was unstable at best. She had her first psychotic episode at age 22 or 23 and her first hospital admission in 1999. T. 313. Diagnosed with bipolar disorder and polysubstance dependence, she was twice admitted to Arkansas State Hospital for lengthy, court-ordered stays. T. 299. She has an extensive history of drug abuse from age 17 to 39, including crystal meth, cocaine, marijuana,

tobacco and alcohol. *Id.* Since 2005[1], Plaintiff has been on a carefully managed prescription regimen of medicines to treat depression (Amitriptyline, Cymbalta, Lexapro, Zoloft), anxiety (Valium, Buspar, Klonopin, Vistaril), ADHD (Strattera), and bipolar disorder (Geoden, Zyprexa, Depakote, Lamictal), side effects of which include drowsiness, weight gain, rash, and zombie-like feeling. T. 292, 299, 351. Her counseling and medication management notes from 2005 to 2009 paint a picture of a roller coaster of emotional and mental instability ranging from mania to thoughts of suicide.

On April 14, 2005, Plaintiff presented to Counseling Associates, Inc., where Dr. Dana Thomason, Ph.D., LPC, LADAC and Dr. Don Pennington, M.D. diagnosed her with bipolar disorder, ADHD and polysubstance dependence in full remission. T. 266. She was assessed with a global assessment of functioning ("GAF")[2] score of 42. On April 26, 2005, Dr. Pennington prescribed Zyprexa and Lexapro. T. 299.

On June 20, 2005, Plaintiff reported increased mood swings, trouble sleeping, and the feeling that she was bordering on another psychotic episode. Dr. Pennington increased her

---

[1] Plaintiff filed for and was paid Social Security disability benefits in 2003, 2006 and 2007. T. 29.

[2] The Global Assessment of Functioning (GAF) Scale is a numerical assessment between zero and 100 that reflects a mental health examiner's judgment of the individual's social, occupational, and psychological function. *Kluesner v. Astrue*, 607 F.3d 533, 535 (8th Cir. 2010). *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR 34 (4th ed. 2000).

    A GAF of 51 to 60 indicates the individual has "[m]oderate symptoms ... or moderate difficulty in social, occupational, or school functioning...."

    A GAF of 41 to 50 indicates the individual has "[s]erious symptoms ... or any serious impairment in social, occupational, or school functioning...."

    A GAF of 31 to 40 indicates the individual has an "impairment in reality testing or communication ... or [a] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood...."

    A GAF of 21 to 30 indicates the individual's "[b]ehavior is considerably influenced by delusions or hallucinations" or the individual has a "serious impairment in communication or judgment ... or [an] inability to function in almost all areas."

    A GAF of 1 to 10 indicates the individual demonstrates a "[p]ersistent danger of severely hurting self or others."

dosage of Zyprexa.  T. 298  On June 27, 2005, Dr. Pennington increased her dosage of Zyprexa again.  T. 297.

On July 19, 2005, Plaintiff reported feeling "manicy" and due to financial constraints was trying to go six months between doctor visits.  T. 296.  On July 25, 2005, her GAF score was 45.  T. 276.

On September 27, 2005, Plaintiff reported increased anxiety, disrupted sleep and increased irritability.  Dr. Pennington added Buspar.  T. 295.

On November 3, 2005, Dr. Thomason noted that Plaintiff had not been attending her therapy sessions with any consistency but that she had been keeping her medication management appointments with Dr. Pennington.  Plaintiff reported increased anxiety.  Her GAF score was 43.  T. 273.

On January 3, 2006, Plaintiff reported that she was "getting down again."  Dr. Pennington increased her Lexapro, gave her samples of Buspar and added Lamictal.  T. 294.

On April 10, 2006, Plaintiff called to report increasing paranoia.  Dr. Pennington advised her to increase Lamictal, continue or increase Zyprexa and continue Lexapro, which may need to be lowered.  T. 293.

On May 1, 2006, Plaintiff's GAF was 43.  T. 263

On June 5, 2006, Plaintiff reported paranoia and insomnia.  Dr. Pennington adjusted her medication, lowering her dosage of Zyprexa, increasing Buspar and continuing Lexapro and Lamictal.  He reported her condition as stable.  T. 292.

On July 10, 2006, Plaintiff discussed her substance abuse history with Dr. Thomason, and he assessed her GAF at 52.  She was showing good response to therapy.  T. 311.

On July 28, 2006, Plaintiff saw Dr. Ben Jacobs, M.D. at Clarksville Medical Group. She reported increasing hypomania, increasing paranoia, anxiety, increasing thoughts of suicide, worsening depression, increased sweating, fatigue and occasional dizziness. Dr. Jacobs noted that she was working hard to feel as well as she could and that she just wanted to feel better. He thought she might be having some drug interaction problems and reduced her Lexapro and added Diazepam (Valium) as a stop gap measure until she could get in to see Dr. Pennington. T. 249.

On August 9, 2006, Plaintiff called Counseling Associates, Inc. to report she was feeling depressed and did not want to go to the hospital. Dr. Pennington advised her to come to the office for samples of Cymbalta. T. 291. On August 21, Dr. Pennington noted that Plaintiff got better after stopping Buspar and that Cymbalta was helping. He stopped the Buspar and Zyprexa, continued Lamictal, Lexapro and Cymbalta, added Geodon and advised her take Valium rarely. T. 290. On August 27, Plaintiff reported to Dr. Thomason that she was doing okay. He assessed her GAF at 48. T. 270.

On September 29, 2006, Plaintiff reported that she was struggling with mood issues and old wounds; she was facing the desire to use substances again. She and Dr. Thomason discussed her issues and he assessed her GAF at 47. T. 310.

On October 23, 2006, Plaintiff reported that her depressive symptoms had improved. Dr. Pennington increased her Cymbalta and continued Geodon, Lamictal and advised Valium every second or third day. T. 289.

On November 17, 2006, Plaintiff worked on sub-personalities in her therapy with Dr. Thomason, who reported she was making very good progress and assessed a GAF score of 48. T. 309.

On December 15, 2006, Plaintiff was in conflict with her mother and not doing well. Dr. Thomason and she talked about her wounded child sub- personality and recognizing her triggers. He assessed a GAF of 48.

On January 5, 2007, Plaintiff was experiencing anger, insomnia and worry about her daughter. Dr. Thomason suggested she learn not to let others blame her and about setting boundaries. He assessed a GAF of 49. On January 8, Dr. Pennington lowered Cymbalta, increased Lamictal, continued Geodon and Valium, and advised minimal Lexapro and Zyprexa as needed. T. 286. On January 31, Dr. Thomas assessed a GAF of 47.

On February 26, 2007, Plaintiff and Dr. Thomason discussed her relationship problems, and he assessed her GAF at 50.

On March 2, 2007, Plaintiff reported feeling overwhelmed, manic and depressed. Dr. Thomason assessed her GAF at 46. On March 18 Dr. Pennington noted that Plaintiff was as compliant as her medication supplies allowed and was in stable condition. He assessed her GAF at 44. T. 285.

On April 11, 2007, Dr. Thomason noted that Plaintiff was making good progress in therapy and assessed her GAF at 48. T. 303. On April 25 Plaintiff was feeling anxiety as a result of having stopped taking all her prescription pain medications[3]. Dr. Thomason and she talked about mindfulness and how medications work and he assigned a GAF of 50. T. 302.

On May 23, 2007, Plaintiff was more depressed and crying. Dr. Thomason assessed her GAF at 44. T. 301.

---

[3] Plaintiff suffered from ovarian cysts.

On July 25, 2007, Dr. Roxanne Marshall at Marshall Medical Clinic discontinued Plaintiff's Cymbalta and Lexapro, adding Effexor for depression and Amitriptyline for insomnia. T. 253. Plaintiff did not show up for her July 30 appointment with Dr. Pennington at Counseling Associates, Inc. T. 282.

On September 25, 2007, Plaintiff complained that she was getting paranoid when not taking the Geodon and that she had run out of Lexapro. She wanted to try Effexor since the samples Dr. Marshall had given her had helped. Dr. Pennington prescribed Valium, Lithium, Geodon, Lexapro, and Lamictal. T. 282.

On November 27, 2007, Plaintiff reported she had been manic the previous night. Dr. Pennington resumed Plaintiff's Cymbalta and continued her other medications, adding Zyprexa as needed. Her GAF was 48. T. 281.

On December 19, 2007, Plaintiff saw Dr. Thomason at DaySpring Behavioral Health Services of Arkansas. She reported feeling worthless, sleeping all the time, loss of interest, social isolation, being easily irritated and angered, being easily distracted, excessive worry, restlessness and impulsive actions. She was lying all the time, losing her temper, eating and buying compulsively and engaging in compulsive sexual behavior. She was experiencing auditory and visual hallucinations and having suicidal thoughts. While she had not used drugs or alcohol in several months, it was a constant struggle not to use. Dr. Thomason counseled her to take all medication as prescribed and terminate her risky behavior. He assessed her GAF at 39. T. 346.

On January 8, 2008, Plaintiff reported that she was visualizing blowing her head off, hearing voices more often and had not slept for the past three nights. She was panicking all the

time and bouncing from high to low.  Dr. Pennington described her condition as "manic" and assessed her GAF at 45.  He increased her Geodon and Lamictal.  T. 280

On February 5, 2008, Plaintiff underwent a consultative psychological examination by Dr. Don Ott, Psy. D.  She reported growing up with five different stepfathers and being the victim of physical, sexual and emotional abuse.  She described being arrested for indecent exposure and terroristic threatening during psychotic breaks.  During the exam Plaintiff appeared sad and tired with very little range of affect and detailed her nine-year history of treatment with psychotherapy and psychotropic medication, including two hospitalizations.  Dr. Ott found her history, symptoms and presentation to be consistent with bipolar disorder.  He assessed her GAF at 50-60 and found no limitations in her activities of daily life, capacity to communicate and interact in a socially adequate manner, capacity to communicate in an intelligible and effective manner, capacity to cope with the typical mental/cognitive demands of basic work-like tasks, ability to attend and sustain concentration on basic tasks, capacity to sustain persistence in completing tasks, or capacity to complete work-like tasks within an acceptable timeframe.  T. 313-318.

On February 12, 2008, Plaintiff reported that she was much better:  her mania had decreased and she was sleeping better.  Dr. Pennington prescribed Valium, Lithium, Cymbalta, Geodon, Lexapro and Lamictal and assessed her GAF at 48.  T. 279.

On March 4, 2008, Social Security Medical Specialist Dr. Jerry Mann reviewed Plaintiff's medical records and determined they supported a "not severe" physical rating.  T. 321. Specialist Dr. Kay Cogbill determined that the records supported diagnoses of ADHD, bipolar disorder and polysubstance dependence.  Dr. Cogbill assessed mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in

maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration. She found the following:

> [Claimant] has ongoing treatment records which indicate that she has some mood swings at times, but recently has been doing well. She was noted recently to be feeling much better, with decreased mania now that she was taking medicine for mania. At recent [consultative examination], she was calm and there were no indications of irritability or mania. There is not evidence of marked or severe impairment in [affect]. [Claimant] cooks, drives, shops and cares for her two children and socializes with friends and family on a regular basis. Rating is unskilled. T. 337, 339.

On March 31, 2008, Dr. Jacobs noted that Plaintiff had been doing well on her present medications and added Strattera and Valium. T. 371.

On May 9, 2008, Social Security Medical Specialist Dr. Dan Donahue reviewed Plaintiff's medical records and affirmed Dr. Cogbill's March 4 assessment. T. 373. On May 22, Plaintiff told Dr. Thomason that her medications were working but that she occasionally used substances of abuse. Dr. Thomason noted Plaintiff's improvement and assessed her GAF at 47. T. 377.

On March 23, 2009, Plaintiff's attorney explained that Plaintiff still becomes suicidal at times, that she cycles between mania and depression and is a spontaneous spender. She described Plaintiff's feelings of worthlessness and fatigue and that she is socially isolated and cannot drive because of her lack of focus due to ADHD. Plaintiff continues to suffer from visual and auditory hallucinations as well as paranoia. T. 40-41. Plaintiff testified that because of her type II personality disorder her personality changes throughout the day. T. 44. Plaintiff testified that she no longer had custody of either of her two daughters; her oldest was under the guardianship of Plaintiff's sister and the youngest was in the custody of the child's father. T. 48. Plaintiff explained that while she was seeing Dr. Thomason she was continuing to suffer from

suicidal thoughts and a lot of manic behavior and felt she was not getting the proper medications from Dr. Pennington. She began seeing Dr. Jacobs for help with obsessive compulsive behavior, ADHD and anxiety attacks. T. 45. She described the doctors' conservative treatment plan, explaining that she feared falling back into a pattern of substance abuse. T. 46. Plaintiff testified that she was benefitting from her medications and felt like she was finally getting the help she needed before she moved. T. 46-47. She said she had an appointment in one week with Dr. Stearman at Western Arkansas Counseling and Guidance in Fort Smith, but the records do not indicate whether she kept that appointment.

On June 18, 2009, Plaintiff reported that she had been sometimes "manic as hell." Dr. Pennington added Lithium and continued Lamictal, Cymbalta, Valium, Geodon and Lexapro. T. 283. Her GAF was 44.

On July 18, 2009, Plaintiff was admitted to Vista Health, a psychiatric hospital in Fort Smith. She had increased anxiety, loss of esteem, paranoid thinking daily, and depression and was not able to sleep for more than two hours at a time. She reported increased panic attacks, manic symptoms and not eating well for the last month and a half. She spoke of delusional thinking and seeing spirits, which she said were true entities that talked to her. She could feel their presence. On admission her GAF was 10. Plaintiff reported having been off her medications for at least a year and a half because she was selling plasma to buy her husband's medications instead. T. 384. Plaintiff received no relief from Thorazine, an anti-psychotic medication. *Id.* Dr. Fayz Hudefl, M.D. started Plaintiff back on her medications, making adjustments over several days until she responded favorably. Plaintiff was able to sleep and stopped hearing voices. After six days in the hospital, Plaintiff had a GAF of 40 and felt safe enough to go home. T. 385. Her medications upon discharge were Geodon, Amitriptyline,

Zoloft, Klonopin, Vistaril and Lamictal. Her condition was guarded regarding her ability to refrain from using alcohol and other illicit drugs. T. 386.

The ALJ found that therapeutic interventions had produced essentially good responses in stabilization of mood and behaviors. T. 70. Although the ALJ was correct in stating that medications were helpful to Plaintiff, who herself testified that at one point she "felt like [she] was finally getting help, [she] was on the right track and getting better…", her therapeutic intervention included constant medication monitoring and adjustments. T. 47.

There is a difference between doing well and being able to work eight hours per day five days per week. In Hutsell v. Massanari, 259 F.3d 707, 712, (8th Cir. 2001), where the Commissioner relied on notes from medical records indicated that the claimant was "doing well", the Court stated:

> We also believe that the Commissioner erroneously relied too heavily on indications in the medical record that Hutsell was "doing well," because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity. *See, e.g., Gude v. Sullivan,* 956 F.2d 791, 794 (8th Cir.1992); *Fleshman v. Sullivan*, 933 F.2d 674, 676 (8th Cir.1991). Given that Hutsell's treating physician has not discharged her from treatment and requires her to see him frequently and that other doctors have concluded that Hutsell's work skills are seriously deficient, "doing well" as a chronic schizophrenic is not inconsistent with a finding of disability.

Defendant points out that Plaintiff's focus on GAF scores is misplaced. Def.'s Br. at 9. While the score is not determinative for Social Security purposes, it certainly bears noting that Plaintiff's treating counselor and physicians consistently rated her GAF to be between 39 and 50 over a period of three years, indicating serious impairment in social, occupational or school functioning. Dr. Ott saw Plaintiff only once and gave her a score of 50-60, indicating moderate difficulties.

The only mental RFC assessments contained in the file were completed by a non-examining, consultative psychologist and a state medical consultant. Here, the ALJ improperly drew inferences from the medical reports, and relied on the opinions of non-treating, non-examining medical consultants who relied on the records of the treating sources to form an opinion of Plaintiff's RFC. The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole. *Jenkins v. Apfel,* 196 F.3d 922, 925 (8th Cir. 1999).

We find that there is substantial medical evidence on the record as a whole from Plaintiff's treating mental health providers that she suffers from marked disabilities that would interfere with her ability to work.

Based upon the more recent indications that Plaintiff's mental impairment may not, in fact, be under control, the Court finds it necessary to remand this matter to the ALJ in order for her to obtain a Mental RFC Assessment from Dr. Thomason and Dr. Jacobs. The ALJ should then re-evaluate Plaintiff's impairments in light of the new mental RFC Assessment.

### IV. Conclusion

Accordingly, the Court concludes that the ALJ's decision is not supported by substantial evidence, and therefore, the denial of benefits to the Plaintiff should be reversed and this matter should be remanded to the Commissioner for further consideration of Plaintiff's capabilities and employment opportunities pursuant to sentence four of 42 U. S. C. §405(g)

ENTERED this 23rd day of August, 2011.

/s/ J. Marschewski

HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE